**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ROBERT DILLON,

*Plaintiff*,

v. No. 3:26-cv-1930-JEP-PDB

CITY OF JACKSONVILLE BEACH, *et al.*,

*Defendants*.
_______________________________________/

**PLAINTIFF'S RESPONSE TO DEFENDANT SCOTT O'CONNELL'S MOTION TO DISMISS**

The Court should deny Defendant Scott O'Connell's Motion to Dismiss ("Motion") (Doc. 59). At the outset, the operative pleading is the First Amended Complaint ("Complaint" or "FAC") (Doc. 35), but the motion is directed to the superseded complaint. Motion at 1 (moving for "an order dismissing the Complaint [DE 1]").[1] That justifies denying the motion outright. Even if the Court charitably construes the motion as directed at the First Amended Complaint, it is substantively deficient.

**INTRODUCTION**

Plaintiff Robert Dillon, a long-time commercial crabber and Fort Myers resident, was wrongfully arrested for a crime he had nothing to do with, in a city hundreds of miles from his home, where he had never set foot. (FAC ¶¶ 1–2, 10, 104.) But for O'Connell's knowing or reckless omissions and misrepresentations in the

[1] Plaintiff discusses and cites to the First Amended Complaint, even though O'Connell cites to the paragraphs in the superseded complaint.

warrant affidavit, no warrant would have issued and Dillon would have suffered no deprivation of his Fourth Amendment rights.

O'Connell's motion rests on a single assertion: that the Complaint "fails to establish that Detective O'Connell knowingly violated any purported constitutional right or acted incompetently." (Motion at 7.) That is precisely what Dillon plausibly alleges. The Complaint comprehensively alleges that O'Connell learned of, and then concealed from the magistrate, seven distinct categories of exculpatory information—evidence he did not stumble past but affirmatively obtained—and that he abandoned every obvious investigative lead that would have confirmed or dispelled his suspicion. (FAC ¶¶ 149(a)–(g), 151–54.) It further alleges that in addition to O'Connell's knowing or reckless omissions, he made three affirmative misrepresentations in the warrant affidavit. (*Id.* ¶¶ 145–147.) Those allegations must be accepted as true, and they adequately state a claim.

Ignoring these well-pleaded allegations, O'Connell relies on a single fact proffered in the warrant affidavit: that an employee at the McDonald's where the crime occurred picked Dillon's photograph out of an array. But that purported identification was tainted by a false-match from a low-reliability facial recognition technology search that built the array around an innocent lookalike rather than a true suspect, by irregularities in administration of the lineup, and by the facts that the employee never saw the encounter at issue, and that she viewed the array more than two months after the incident. (*Id.* ¶¶ 29-30, 71, 121, 123.) Significantly, the victim—the only person who actually interacted with the suspect—was never shown any photographs at all.

(*Id.* ¶ 122.) Moreover, the witness's account of the suspect as a "regular customer" was irreconcilable with everything O'Connell *already knew* about Dillon, including that he lived 300 miles away, denied ever having been to Jacksonville Beach, and had a distinctive facial scar that even cursory comparison would have proved inconsistent with the suspect's image. (*Id.* ¶¶ 71-72, 104-06, 121.)

Fatally, the motion never engages with the framework that governs warrant-based claims in this Circuit. Where a plaintiff alleges the affidavit in support of the warrant was materially false or incomplete, a court removes the misstatements, inserts the omissions, and asks whether the corrected affidavit establishes even arguable probable cause. *Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324, 1327 (11th Cir. 2024). O'Connell does not cite that rule. Nor does he acknowledge a single alleged misstatement or omission. Instead, he asks this Court to accept as accurate the very affidavit Plaintiff alleges was false in what it included and incomplete in what it omitted. The motion should be denied.

## PROCEDURAL HISTORY

Dillon filed this case on June 10, 2026. His First Amended Complaint alleges individual-capacity Fourth Amendment malicious-prosecution claims against O'Connell and Jacksonville Sheriff's Office Sergeant James Walters, and *Monell* claims against the City of Jacksonville Beach and Jacksonville Sheriff T.K. Waters. (FAC ¶¶ 251–77.) Walters, Jacksonville Beach, and Waters each answered the First Amended Complaint. (Docs. 45, 46, 48.) Only O'Connell moved to dismiss.

## FACTUAL BACKGROUND

### A. The Offense and the Degraded Images

One night in 2023, a man twice asked a young girl to leave a Jacksonville Beach McDonald's with him. (FAC ¶¶ 57–58.) The next morning, a Jacksonville Beach PD officer accessed the store's surveillance system but did not export the digital video. He instead photographed a computer screen displaying the footage with his cell phone. The image of the suspect is low-resolution, partially shadowed, and the suspect is turned off-axis. (*Id.* ¶¶ 63–68.) O'Connell then circulated those cell-phone photos of a computer screen (not the video footage itself) to partner law enforcement agencies. It was those poor-quality photos that were run through facial recognition technology. (*Id.* ¶¶ 81–82.)

### B. The Algorithm, and O'Connell's Immediate Certainty

Over a month later, Jacksonville Sheriff's Office Sergeant James Walters reported that "[t]he photos revealed a 93% match on facial features to Robert Dwayne Dillon." (*Id.* ¶ 86.) Walters disclosed nothing about how many candidates the search returned, their scores, or the quality of the probe images, and attached no caveat. (*Id.*¶¶ 88–94.) O'Connell, who was assigned by the Jacksonville Beach Police Department as its lead investigator for this case, did not ask any questions. (*Id.* ¶ 95.) The 93% figure was in fact an algorithmic similarity score, which is *not* a probability that two images depict the same person. (*Id.* ¶ 20.) And a General Order of the Jacksonville Beach Police Department directs that such results are "strictly investigative leads." (*Id.* ¶¶ 12, 41, 69.)

That same afternoon, O'Connell called Dillon and said he was "convinced it was you." (*Id.* ¶¶ 99–102.) Dillon denied involvement, stating that he lived in Fort Myers (300 miles from Jacksonville Beach), and had never been to Jacksonville Beach. He also described the distinctive scar running from his hairline to his nose, and offered to cooperate with the investigation. (*Id.* ¶¶ 103–08.) Over the more than seven months between that call and his warrant application, O'Connell made no effort to corroborate or refute anything Dillon had told him, even though cell phone location records, time-stamped photos, and financial records were all available to confirm or dispel his account. (*Id.* ¶¶ 130–41, 154.)

### C. The Array O'Connell Built Around the Algorithm

"Based entirely on the results of the FRT search," O'Connell requested an array featuring Dillon. (*Id.* ¶ 114.) In January 2024, at O'Connell's instruction, another officer showed the array to a McDonald's employee, Brenda Wilson—first one photograph at a time, then all six simultaneously for side-by-side comparison. (*Id.* ¶¶ 116–17.) Ms. Wilson selected Dillon from the array. (*Id.* ¶ 119.) But she had told O'Connell months earlier that on the night of the incident she was "occupied with her duties and did not see or hear all the suspect's specific statements" to the victim. (*Id.* ¶¶ 71, 121.) Her familiarity came from seeing the suspect as a "regular customer," and she explained that since the incident, the suspect had not returned to the McDonald's. (*Id.* ¶¶ 72, 78, 121.) The victim was never shown any photographs. (*Id.* ¶ 122.)

### D. The Negative License Plate Results and Six Months of Silence

That same month, O'Connell requested license plate reader data for both of the vehicles registered to Dillon for the day before, the day of, and the day after the offense. Neither vehicle was captured anywhere in Duval County. (*Id.* ¶¶ 125–27.)

Between January 19 and July 31, 2024, the file reflects no investigative activity at all—no contact with the victim, no comparison of Dillon's scar to the footage, no request for the McDonald's mobile-ordering or payment records that could have identified the suspect, and no review of earlier footage of the "regular customer" suspect. (*Id.* ¶¶ 130–41, 154.)

### E. The Warrant Affidavit

In July 2024, over six months after his investigation went dormant, O'Connell submitted an affidavit seeking Dillon's arrest. A judge signed it the next day. (*Id.* ¶¶ 142–43.) O'Connell disclosed none of what he had learned. Not the negative license plate results. Not O'Connell's call to Dillon where Dillon denied the allegations and advised O'Connell that he has a visible scar on his face. Not the contradiction of how someone who lives more than 300 miles and five hours away could be a "regular customer." Not the degraded quality of the images fed to the algorithm. And not his own department's policy that a facial recognition result is "strictly" an investigative lead. (*Id.* ¶ 149(a)–(g).)

What O'Connell did include was also affirmatively wrong. He described the photo array as "sequential" when all six photos had also been shown to the witness simultaneously. He told the judge that Ms. Wilson had "provided a similar suspect

description as the victim"—a comparison to a victim description that the Complaint alleges never existed. And he reported that Ms. Wilson had identified "the same subject identified by Sergeant Walters using facial recognition technology," presenting a single algorithmic error as two independent sources in agreement. (*Id.* ¶¶ 144–47.)

Had these omissions been supplied and the misstatements corrected, "no arrest warrant would have been issued." (*Id.* ¶¶ 6, 155, 254.) Dillon's Fourth Amendment rights were violated when he was arrested at home in front of his wife, held overnight, and prosecuted for sixty-nine days before the State Attorney dropped all charges. (*Id.*¶¶ 159–74.)

## LEGAL STANDARD

On a Rule 12(b)(6) motion, the Court accepts the Complaint's well-pleaded allegations as true and draws all reasonable inferences in Plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Qualified immunity is an affirmative defense typically addressed at summary judgment; although it may be raised on a motion to dismiss, the motion will only "be granted if the 'complaint fails to allege the violation of a clearly established constitutional right.'" *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002) (quoting *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2002) (reversing a grant of qualified immunity at the pleading stage where the complaint alleged, among other things, that the plaintiff "did not fit the description of the suspect being sought"). Review is "limited to the four corners of the complaint," and the court "must construct [its] own firewall between the facts pleaded in the complaint and any

evidence, construing the complaint in the favor of the plaintiff[].” *Id.*; *see Laskar v. Hurd*, 972 F.3d 1278, 1296 (11th Cir. 2020).

## ARGUMENT

### I. The motion impermissibly requires the Court to credit O’Connell’s affidavit over the Complaint.

O’Connell cannot reject or overlook the Complaint’s well-pleaded allegations. His motion’s premise is that “[t]he warrant application was based on a facial recognition program which revealed a 93% match to Plaintiff as well as a witness identification from an independent witness.” Motion at 1. That sentence is the entire motion, and every word of it contradicts the Complaint it seeks to dismiss.

The Complaint alleges that the “93% match” was a “highly misleading” characterization of a similarity score that measures nothing more than digital proximity between templates (FAC ¶¶ 20, 87); that Ms. Wilson was not an eyewitness to the offense (*id.* ¶¶ 71, 121); and that her identification was not independent of the facial recognition algorithm but generated by it, through an array assembled around the candidate the algorithm produced, which was algorithmically designed to look similar to the suspect. (*Id.* ¶¶ 114, 123.) O’Connell’s motion essentially disputes these fundamental allegations—something he simply cannot do on a motion to dismiss. *S. Y. v. Wyndham Hotels & Resorts, Inc.*, 519 F. Supp. 3d 1069, 1078-80 (M.D. Fla. 2021).

### II. The Complaint plausibly alleges that O’Connell violated the Fourth Amendment.

The Complaint sufficiently alleges malicious prosecution. A Fourth Amendment malicious prosecution claim requires four elements: “(1) the plaintiff was

seized under legal process; (2) the legal process justifying the plaintiff's seizure was constitutionally infirm; (3) the suit or proceeding terminated in the plaintiff's favor; and (4) the seizure would not otherwise be justified without legal process." *Gervin v. Florence*, 139 F.4th 1236, 1248 (11th Cir. 2025). The Complaint plausibly alleges all of these elements. O'Connell seized Dillon "under legal process" by seeking and obtaining the arrest warrant. (FAC ¶¶ 142, 159.) O'Connell's warrant affidavit contained material omissions and misstatements in violation of the Fourth Amendment. (*Id.* ¶¶ 149–55.) All charges against Dillon were dropped. (*Id.* ¶ 174.) And had O'Connell not omitted exculpatory evidence or included misstatements in his affidavit, Dillon would not have been arrested. (*Id.* ¶ 155.)

Failing to acknowledge the Complaint's allegations of how O'Connell recklessly disregarded the truth in his affidavit, O'Connell's motion challenges only the second element—that the legal process leading to Mr. Dillon's arrest was unconstitutional. Motion at 5. When considering all of the facts Dillon alleges, however, it is clearly plausible that O'Connell violated the Fourth Amendment and that a corrected affidavit would not have supported probable cause.

**A. The corrected-affidavit framework governs warrant-based claims.**

Where an arrest follows a warrant, the constitutional question is not what the officer knew but what he told the magistrate. "[T]he lawfulness of seizures pursuant to legal process turns on the validity of the legal process itself," and "an otherwise insufficient affidavit cannot be rehabilitated [with] information possessed by the [officer] when he sought the warrant but not disclosed to the issuing magistrate."

*Williams v. Aguirre*, 965 F.3d 1147, 1162 (11th Cir. 2020) (alterations in original) (quoting *Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971)). A plaintiff establishes constitutional infirmity by showing the affiant "intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Luke v. Gulley*, 50 F.4th 90, 95–96 (11th Cir. 2022).

The court asks "whether there was an intentional or reckless misstatement or omission," and then "whether probable cause would be negated if the offending statement was removed or the omitted information included." *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019); *see Franks v. Delaware*, 438 U.S. 154 (1978) (evaluating a claim that a search warrant was unconstitutional because of misstatements in the affidavit); *Madiwale v. Savaiko*, 117 F.3d 1321, 1326–27 (11th Cir. 1997) (same). Put concretely: the court "remove[s] from the affidavit any false or misleading inculpatory statements, insert[s] any omitted exculpatory information, and then assess[es] whether the corrected affidavit is still able to establish at least arguable probable cause." *Sylvester*, 94 F.4th at 1331; *accord Butler v. Smith*, 85 F.4th 1102, 1112 (11th Cir. 2023) (court considers only the information before the magistrate, minus material misstatements, plus material omissions).

At the pleading stage, the first inquiry is answered by the allegations themselves. In *Paez*, the Eleventh Circuit explained: "Because at this stage in the proceedings we must accept the facts as alleged in the complaint as true, we take as true that the exculpatory information was known to [the officers] and their omission was made either intentionally or in reckless disregard of the truth." 915 F.3d at 1287. "Our only

question, then, is whether the affidavits still would have established probable cause . . . if they had included the omitted information." *Id.*

O'Connell's motion does not mention the corrected-affidavit test, instead citing cases involving *warrantless* arrests. *See* Motion at 5. He also misstates Mr. Dillon's burden, asserting that Plaintiff "is required to allege facts establishing the absence of any debatable point as to whether probable cause existed." (*Id.*) Neither *Iqbal* nor *Epps*, cited by O'Connell, announces such a rule, and it is not the law. The standard on a motion to dismiss is plausibility, not "the absence of any debatable point." Nor does the motion acknowledge any of the misstatements and omissions the Complaint identifies. It simply recites what the affidavit said and asks the Court to stop there.

### B. The corrected affidavit does not establish even arguable probable cause.

The Complaint properly alleges O'Connell's misstatements and omission with particularity. Paragraph 149 catalogues precisely what O'Connell knew and withheld: (a) the negative license plate reader results for both of Dillon's vehicles; (b) the contradiction between the description of the suspect as a "regular customer" at a McDonald's in Jacksonville Beach and Dillon's residence 300 miles away; (c) Dillon's denial, his statement that he had never been to Jacksonville Beach, and his distinctive facial scar; (d) the degraded quality of the probe images that O'Connell circulated to partner agencies; (e) O'Connell's failure to follow his department policy that facial recognition results are "strictly investigative leads"; (f) the photo array's non-sequential character; and (g) relying on Ms. Wilson's identification despite that she

did not observe the encounter between the suspect and victim. The Complaint also separately identifies three affirmative misrepresentations in the affidavit: that Ms. Wilson gave "a similar suspect description as the victim" when the victim gave none; that the array was "sequential" when Ms. Wilson was shown six photographs at once; and that she identified "the same subject identified by Sergeant Walters"—presenting one algorithmic error as two sources in agreement. (FAC ¶¶ 144–47.)

After stripping out O'Connell's misstatements and filling in his material omissions, the affidavit would have told the judge the following: The identification came from a facial recognition search using a low-quality probe image, which consisted of a photo of a computer screen with the suspect's face partially obscured, and lighting casting a shadow on his face. (*Id.* ¶¶ 68, 92–93.) The resulting 93% figure was a similarity rating on physical features, not a probability on the identity of the suspect. (*Id.* ¶ 20.) Under department policy, Dillon was nothing more than a lead to be looked into. (*Id.* ¶ 41.) The sole identifying witness had not observed the encounter, and viewed an array assembled around the facial recognition search result which was shown to her simultaneously. (*Id.* ¶¶ 71, 114, 117, 121.) The victim herself gave no description and saw no array. (*Id.* ¶¶ 122, 145.) The actual suspect was a "regular" at a restaurant 300 miles from Dillon's home, in a city he had never visited. (*Id.* ¶¶ 72, 79, 104.) License plate readers placed neither of Mr. Dillon's vehicles in Duval County during the relevant timeframe. (*Id.* ¶¶ 125–27.) And Dillon denied the offense, and described a distinctive facial scar the suspect did not have. (*Id.* ¶¶ 103–08.)

Probable cause requires facts allowing "a person of reasonable caution to believe" there was "a substantial chance" the suspect committed the offense. *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (quoting *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010); *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022)). The Complaint plausibly alleges that a corrected affidavit would not have supported probable cause. The Eleventh Circuit's treatment of a materially similar misidentification is instructive. In *Daniels v. Bango*, an officer misidentified an innocent man as a drug dealer and omitted from his affidavit the discrepancies between the suspect's account and the plaintiff's record, as well as the physical differences between the two men. 487 F. App'x 532, 538–40 (11th Cir. 2012). The court affirmed the denial of qualified immunity, reasoning that the misleading information "was the only information in the affidavit that tied Daniels to the drug deal," and that the "physical differences … coupled with the significant discrepancies between the suspect's story and the information about Daniels" meant "no reasonable officer could have concluded that he had arguable probable cause." *Id.* at 539-40.

The same applies here. No person of reasonable caution reading O'Connell's corrected affidavit could find a substantial chance that Dillon was the man in the McDonald's. *Sylvester*, 94 F.4th at 1335 (corrected affidavit failed to establish arguable probable cause where the omitted timeline made the plaintiff's guilt impossible). The Complaint makes this specific allegation which must, of course, be deemed to be true at this stage of the litigation. (FAC ¶¶ 6, 155, 254.)

**C. The Complaint plausibly alleges intent or recklessness.**

Recklessness may be inferred from the omission itself. Thus, "when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself." *Madiwale*, 117 F.3d at 1327 (citation omitted). As explained above, the Complaint specifically alleges numerous omissions that are critical because a corrected affidavit would not have supported a finding of probable cause.

In addition, actual knowledge of omitted exculpatory information "would provide a sufficient basis for a jury to conclude that the omissions of those facts were intentional." *Sylvester*, 94 F.4th at 1332. Here, O'Connell did not merely possess the exculpatory facts; he generated them. He chose to distribute the low-resolution photographs of the computer screen that displayed the surveillance footage. (FAC ¶ 81.) He requested the license plate search. He interviewed Ms. Wilson. He called Dillon and heard him deny the offense and describe his distinctive facial scar. (*Id.* ¶¶ 151–53.) O'Connell omitted that call from his investigative file altogether, not to mention the warrant affidavit. (*Id.* ¶ 112.)

O'Connell's failure to further investigate the exculpatory information also contributes to inferring intent or recklessness. An "arresting officer is required to conduct a reasonable investigation to establish probable cause," *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998), and "when an officer possesses information that would cause a reasonable officer to have serious doubts about the identity of a suspect, the officer is required to either take additional steps to confirm the suspect's identity

before submitting the warrant application or include the contradictory information in the warrant application." *Daniels*, 487 F. App'x at 539 (citing *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989), and *U.S. v. Kirk*, 781 F.2d 1498, 1503 (11th Cir. 1986)). An officer who "possesse[s] information giving rise to an exculpatory inference" but does nothing to examine the "easily discoverable facts that would confirm or contradict that inference" acts recklessly. *Gervin*, 139 F.4th at 1249 (quoting *Washington v. Rivera*, 939 F.3d 1239, 1248 (11th Cir. 2019)); *Kirk*, 781 F.2d at 1503; *see Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004) (officer may not turn a blind eye to "easily discoverable facts"), *abrogated on other grounds*, *Washington v. Howard*, 25 F.4th 891 (11th Cir. 2022).

The investigation's six-month gap compounds the problem. *Tillman*, 886 F.2d at 321 (finding it unreasonable that an officer harbored doubts for three months with no further investigation). Despite having months to do so, O'Connell did not investigate Dillon's facial scar against the surveillance footage, investigate whether Dillon had any connection to Jacksonville Beach given the suspect's "regular customer" status, follow up on the negative license plate search results, or follow up on Dillon's willingness to cooperate. (FAC ¶¶ 129–41.) The Complaint alleges that O'Connell held every one of these exculpatory facts for more than six months, took no step to resolve any of them, and then swore an affidavit that mentioned none of them. (*Id.* ¶¶ 152–54.)

**D. The photo array cannot supply what the affidavit omitted.**

Rather than contend with O'Connell's omissions and misrepresentations in the

warrant affidavit, the motion's premise is that there was arguable probable cause because Ms. Wilson's selection was "a witness identification from an independent witness." Motion at 1. But that ignores the Complaint's well-pleaded facts that it was *not* an independent witness identification and that inconsistencies raised serious doubts about the identification.

The photo array's setup ensured that Ms. Wilson's identification would not be independent from the lead produced by the facial recognition search. O'Connell requested the array "[b]ased entirely on the results of the FRT search." (FAC ¶ 114.) Facial recognition returns the faces most resembling the probe image, so a false match is by design a lookalike of the true perpetrator; the fillers are then selected to resemble that candidate rather than the perpetrator. The algorithm's pick therefore becomes, almost by definition, the array's closest match to the witness's memory of the true suspect. (*Id.* ¶¶ 29–30, 123.) What the affidavit presented as convergence between two sources was instead "the same algorithmic error surfacing twice." (*Id.* ¶ 30.)

Jacksonville Beach PD's own General Order says as much. It provides that facial recognition results "are strictly investigative leads to assist with subject identification and/or verification," and that any law enforcement action must rest on "the agency's own identity determination and not solely the results." (*Id.* ¶ 41.)

Here, O'Connell presented the array identification to the judge as independent confirmation of the FRT result, when it was the algorithm's own output duplicated in another form; he misdescribed how the array was administered; he obtained the purported identification from a witness who had not seen the crime; and he disclosed

none of the evidence cutting the other way. (*Id.* ¶¶ 121, 144–47, 149.)

Furthermore, the Complaint pleads three independent reasons a reasonable officer would have harbored serious doubts. *First*, Ms. Wilson did not witness the offense; she was occupied with her duties when the crime occurred. (*Id.* ¶¶ 71, 121.) *Second*, she described the suspect as a "regular customer" she had seen several times—while O'Connell knew Dillon lived 300 miles away and had confirmed through license plate readers that his vehicles were not in Duval County on the relevant days. (*Id.* ¶¶ 72, 79, 125–27.) *Third*, more than two months had elapsed before she viewed the array. (*Id.* ¶ 121.) Meanwhile the victim—the one person who interacted with the suspect—was never asked for a description and never shown an array. (*Id.* ¶¶ 122, 145.) And, as explained above, *supra* Section II.C, O'Connell recklessly disregarded the truth by failing to investigate these inconsistencies.

### E. O'Connell's authorities do not support dismissal on these allegations.

Furthermore, O'Connell's cited authorities are inapposite. All but two of the authorities he offers were decided on a developed factual record rather than on the pleadings. *Rushing*—itself a misidentification case—was decided on summary judgment, as were *Brock*, *Brown*, *Hendricks*, *Hill*, *Holmes*, *Lee, Mears, Eslinger, Scarbrough,* and *Gold*.[2] Whatever those summary judgment records showed, they say nothing about

[2] *Rushing v. Parker*, 599 F.3d 1263 (11th Cir. 2010); *Brock v. City of Zephyrhills*, 232 F. App'x 925 (11th Cir. 2007); *Brown v. Abercrombie*, 151 F. App'x 892 (11th Cir. 2005); *Hendricks v. Sheriff, Collier Cnty., Fla.*, 492 F. App'x 90 (11th Cir. 2012); *Hill v. Orange Cnty. Sheriff*, 666 F. App'x 836 (11th Cir. 2016); *Holmes v. Kucynda*, 321 F.3d 1069 (11th Cir. 2003); *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002); *Mears v. McCulley*, 881 F. Supp. 2d 1305 (N.D. Ala. 2012); *Case v. Eslinger*, 555 F.3d 1317, 1324 (11th Cir.

the sufficiency of allegations under Rule 12(b)(6).

*Banks v. Bostic* is the only authority O'Connell cites that dismissed a warrant-based malicious prosecution claim on the pleadings. No. 17-13986, 2018 WL 1158306 (11th Cir. Jan. 10, 2018) There, the arrest warrant affidavit recited that the victim herself, who "personally encountered the burglar at her front door," selected the plaintiff from a six-person array, and the victim separately "signed a sworn complaint before the magistrate judge" identifying the plaintiff as the burglar. *Id.* at *1. The plaintiff alleged no omitted exculpatory evidence whatever. Instead, her theory was that the victim's identification was inherently unreliable given the victim's age and race, and that the officer had misused the term "photo line-up" because the array had not been assembled around an already-identified suspect. *Id.* The court rejected both arguments, observing that the plaintiff "cite[d] no cases—from this court or any other—to support her theory," and resolved the appeal solely on the clearly-established prong without deciding whether any constitutional violation had occurred at all. *Id.* at *2–3.

Every one of those features is reversed here. The identifying witness was not the victim and did not see the offense; the victim was never shown an array; and neither the victim nor the purported eyewitness appeared before the magistrate. (FAC ¶¶ 71, 121–22.) Here, the Complaint does not quarrel with terminology—it alleges that the affidavit (1) affirmatively misrepresented how the photographs were shown to Ms.

---

2009); *Scarbrough v. Myles*, 245 F.3d 1299 (11th Cir. 2001); *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998).

Wilson (sequential vs. simultaneous); (2) attributed to Ms. Wilson a description "similar" to a victim description that never existed; and (3) omitted seven categories of exculpatory evidence O'Connell himself generated seven months before seeking the arrest warrant. (*Id.* ¶¶ 144–47, 149.)

O'Connell's other cited authorities also have material factual differences that make them inapposite. The Complaint alleges multiple issues regarding the witness identification in both the setup and reasons to doubt the result; by contrast, in *Rushing*, *Brock*, and *Mears*, there were no facts in the record to question the validity of the witness identifications. *Rushing*, 599 F.3d at 1268; *Brock*, 232 F. App'x at 928; *Mears*, 881 F. Supp. 2d at 1322–23. Many of these cases also involve more evidence than a single identification from a photo array. For example, in *Brown*, there was also additional evidence associating the plaintiff with a vehicle seen at the crime scene. 151 F. App'x at 894. And the other six cases were about *warrantless* arrests, not faulty warrants tainted by omissions and misstatements. *Hendricks*, 492 F. App'x at 91–92; *Holmes*, 321 F.3d at 1078; *Lee*, 284 F.3d at 1190–92; *Scarbrough*, 245 F.3d at 1301; *Gold*, 151 F.3d at 1348; *Eslinger*, 555 F.3d at 1324.

## III. The Constitutional Right Was Clearly Established

"[I]t was and is clearly established that intentionally or recklessly omitting material information from a warrant affidavit violates the Fourth Amendment." *Butler*, 85 F.4th at 1117. Officials "violate clearly established Fourth Amendment law if they knowingly or recklessly make false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen . . . if such false statements were

necessary to the probable cause." *Gervin*, 139 F.4th at 1259 (quotation omitted).

A plaintiff who pleads material misstatements or omissions plus a culpable state of mind "overcomes qualified immunity." *Sylvester*, 94 F.4th at 1330. And an officer's omissions defeat immunity where they are "so clearly material that every reasonable law officer would have known that their omission would lead to a [seizure] in violation of federal law." *Madiwale*, 117 F.3d at 1327 (quoting *Haygood v. Johnson*, 70 F.3d 92, 95 (11th Cir. 1995)). *Laskar* confirms this analysis applies at the pleading stage. There, the Eleventh Circuit held that a plaintiff who alleged the warrant affidavit rested on knowingly or recklessly false accusations had alleged a violation of clearly established law, and that the officers were "not entitled to qualified immunity at this stage of the suit." 972 F.3d at 1297-98.

So too here. No reasonable officer could believe it lawful to withhold from a magistrate that license plate readers did not place the suspect's vehicles within Duval County on the days on, before, and after the offense; that the accused had a distinguishing facial feature the suspect lacked; that he lived 300 miles from the scene of the crime, which is inconsistent with the suspect being a "regular customer" there; that the identifying witness never saw the crime; that the photo array presentation was suggestive; and that the facial recognition technology search was conducted on low-quality probe images, and returned a result that the department's own policy made clear could only be used as a lead.

## CONCLUSION

For all these reasons, O'Connell's motion to dismiss should be denied.

Respectfully submitted September 15, 2026,

*/s/ Steven M. Silverberg*

Ira J. Lipton*
Siddartha Rao*
Steven M. Silverberg*
**Hoguet Newman**
**Regal & Kenney, LLP**
60 East 42nd Street, 48th Floor
New York, NY 10165
(212) 689-8808
ilipton@hnrklaw.com
srao@hnrklaw.com
ssilverberg@hnrklaw.com

**Special admission*

Nicholas L.V. Warren (FBN 1019018)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
dtilley@aclufl.org

Nathan Freed Wessler*
Lauren J. Yu*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
nwessler@aclu.org
lyu@aclu.org

*Counsel for Plaintiff*